# __SUMMARY OF EXPERT OPINION__

**Jeffrey S. Rothbart**

**Federal National Mortgage Association**

**Plaintiff**

**v.**

**Brookville Schoolhouse Road Estates, LLC**

**Defendant**

**US District Court: Civil Action No. 1:17-CV-00170-SA-DAS**

**February 20, 2019**

Exhibit "A"

Jeffrey S. Rothbart, the Managing Member of Real Estate Expert Witnesses, LLC ("REEW"), has been retained as an expert witness by Brookville Schoolhouse Road Estates, LLC ("Brookville") the Defendant in the instant matter.

**REAL ESTATE EXPERT WITNESSES & JEFFREY ROTHBART:**

1. Mr. Rothbart has over 15 years of institutional, commercial and residential real estate experience including, but not limited to, development, general contracting acquisitions, debt financing and lending standards, asset/portfolio management, capital markets, leasing, dispositions, sustainability and brokerage.

2. Over the course of his career, Mr. Rothbart has participated in over $3 billion worth of real estate transactions, across property types, geography and risk profile.

3. Mr. Rothbart published over 40 articles and research reports on the commercial real estate markets which were cited in over 100 different real estate publications.

4. Mr. Rothbart has also consulted, either as an expert witness or on a third-party basis, in over 20 matters. Previous clients include municipalities, governmental agencies, universities, insurance companies, creditors to bankruptcy, equity investors, developers, property owners, tenants and individual homeowners. A complete CV, article and prior testimony list is attached hereto as Exhibit A.

5. Mr. Rothbart has a B.A. from Emory University, a J.D. from IIT-Chicago Kent College of Law and an LL.M. in Taxation from Northwestern University.

6. Additionally, Mr. Rothbart is an Adjunct Professor of Law at IIT-Chicago Kent College of Law, a licensed Illinois attorney, a licensed Illinois Real Estate Broker, a LEED-AP for New Construction v2.2 and formerly held NASD Series 22 and 63 licenses. Finally, Mr. Rothbart has been a 'market participant' for the PwC Korpacz Real Estate Investor Survey for over twelve years.

**DOCUMENTS REVIEWED**

1. The following documents were reviewed and considered in forming the opinions stated herein:
   a. Amended Verified Complaint for Breach of Contract, Injunctive Relief, and Other Equitable and Legal Relief dated March 3, 2018, and all exhibits thereto (the "Complaint");
   b. Answer and Affirmative Defenses of Brookville Schoolhouse Road Estates, LLC To Plaintiff's Amended Verified Complaint dated April 22, 2018 (the "Answer");
   c. Dominion Due Diligence Group TPA Project Capital Needs Assessment dated December 8, 2011 (the "2011 Dominion Report");
   d. Commercial Due Diligence Services Survey dated January 26, 2012 (the "2012 Survey");
   e. Physical Needs Assessment performed for Arbor Commercial Mortgage, LLC by Building Evaluation Services and Technology ("BEST") dated December 13, 2013 (the "2013 BEST Report");

    f.  Butler Burgher Group, LLC's Appraisal dated February 24, 2014 (the "2014 Appraisal");

    g.  AEI Consultants March 29, 2017 Report (the "2017 AEI Report");

    h.  The 11/1/17 Arbor Multifamily Lending, LLC Account Statement (the "2017 Statement");

    i.  Baker Donelson's December 19, 2017 Reservation of Rights as to Payments Tendered Post-Default and Acceleration.

    j.  AEI Consultants May 30, 2018 Report (the "2018 AEI Report");

    k.  Velocity Consulting, Inc. Report dated February 19, 2019 (the "Velocity Report");

    l.  Affidavit of Chaim Puretz filed February 20, 2019 (the "2019 Borrower Affidavit");

    m.  W. M. Brooks & Associates, LLC Appraisal dated February 19, 2019 (the "2019 Appraisal") and

    n.  Various emails and correspondence.

**DEFINED TERMS:**

1. "AEI" shall be defined as AEI Consultants.
2. "AEI Reports" shall be defined as both the 2017 AEI Report and the 2018 AEI Report.
3. "Arbor" shall be defined as Arbor Commercial Mortgage, LLC, the originator and servicer of the Fannie Mae loan for the Property.
4. "Borrower" shall be defined as in the Loan Documents.
5. "Brookville" shall be defined as the Defendant.
6. "Closing Date" shall be defined as the date of the Refinance on February 14, 2014.
7. "Default Letter" shall be defined as the June 16, 2017 default letter from Bryan Cave to Brookville.
8. "Default Notice" shall be defined as the August 18, 2017 letter from Baker Donelson to Brookville stating Notice of Default, Acceleration & Revocation of Right to Collect Rents.
9. "Demand Letter" shall be defined as the May 4, 2017 letter from Fannie Mae to Brookville.
10. "Fannie Mae" shall be defined as the Federal National Mortgage Association, or Plaintiff.
11. "Loan Documents" shall be defined as the totality of the loan documents between Fannie Mae and Brookville including, but not limited to, the Loan Agreement, the Note, the Deed of Trust, UCC Financing Statements and Guaranty.
12. "Lender" shall be defined as Abor and Fannie Mae.
13. "PCA" shall be defined as Property Condition Assessment;
14. "Property" shall be defined as Brookville Apartments' located at 305 Everglade Avenue, Starkville, MS 39759 The Property is a Class-C multi-family apartment complex which was constructed in 1970. The Property consists of 27, two-floor buildings totaling 120 tenant units situated on 12.35 acres;
15. "Purchase Date" shall be defined as the date Brookville acquired the Property on July 18, 2012; and
16. Fannie Mae's proposed, though never appointed, "Receiver" shall be defined as Tarantino Properties, Inc.
17. "Replacement Reserve" shall be the $219,895 in reserves held by the Lender per the 2017 Statement.

**TIMELINE OF CRITICAL EVENTS:**

1. July 18, 2012– Brookville acquires the Property.  As part of this acquisition, the 2011 Dominion Report was issued.

2. February 14, 2014 – Brookville refinances the Property with a loan from Fannie Mae, via Arbor, in the amount of $1,995,000.00 (the "Refinance").[1] As part of the Refinance, the 2013 BEST Report and 2014 Appraisal were both procured and relied upon by Arbor.

3. March 27, 2017 – AEI issued the 2017 AEI Report. The 2017 AEI Report purported to recommend repairs and replacements necessary at the Property.

4. May 4, 2017 –Among other things, the Demand Letter requested Brookville deposit, within ten (10) days a total of $414,650 for "Immediate Repairs."  Pursuant to this letter, Arbor, as agent for Fannie Mae alleges that Brookville's failure to comply in strict accordance therewith would amount to a default under the Loan Documents.

5. May 17, 2017 – Brookville's attorneys emailed Arbor, as agent for Fannie Mae, to state that a formal response to the May 4, 2017 demand letter would be issued the following day.

6. May 18, 2017 – Brookville replied to the Demand Letter objecting to the proposed default as work already performed had not been reflected in the 2017 AEI Report. As such, Borrower requested that an independent third-party verify the findings of the 2017 AEI Report. This additional third-party verification was proposed to be paid for exclusively by Brookville at its sole cost and expense, and completed within 20 business days.

7. May 24, 2017 – In a follow up to a conference call, Brookville's attorneys asked for a subsequent call in several days (after the Arbor/Fannie Mae team had a chance to conference internally) to further discuss Brookville's request for second PCA to be conducted.

8. June 6, 2017 – Brookville's attorneys left a detailed message for Michelle Pirritano, AVP Loan Surveillance, Arbor Realty Trust, Inc.

9. June 16, 2017 – Bryan Cave, in its capacity as counsel for Fannie Mae, replied to Brookville's May 18, 2017 letter by issuing the Default Letter which rejected Brookville's request for a second PCA and placed Brookville into default under the Loan Documents.

10. August 18, 2017 – Baker Donelson, in its capacity as replacement counsel for Fannie Mae, sent to Brookville the Default Notice.

11. March 28, 2018 – The Complaint is filed by Plaintiff requesting the appointment of a Receiver and other injunctive relief.

12. April 22, 2018 – Brookville filed its Answer with Affirmative Defenses.

---

[1] Complaint Section A8

13. May 30, 2018 – AEI issued the 2018 AEI Report.

14. February 19, 2019 – Both the Velocity Report and the 2019 Appraisal were issued.

## ULTIMATE EXPERT OPINIONS:

### 1. *Arbor and/or Fannie Mae Had Direct Knowledge of the Property Condition as of the Closing Date*

Simply put, neither the 2017 AEI Report nor the 2018 AEI Report presented Arbor and/or Fannie Mae with any new or changed information on the condition of the Property. Since the subject loan was commenced while these issues were known to exist, Arbor and/or Fannie Mae cannot now/later utilize those same issues to manufacture a claim of default.

The Demand Letter sought $414,650 for "Immediate Repairs" at the Property. This amount was then increased to $604,600 by the 2018 AEI Report. This demand was so high that it was equal to 30% of the total loan value and 19.5% of the Property's total value (both as of the Closing Date)! The funds were to be escrowed within 10 days. As a general matter, not all borrowers are able to provide funds, within 10 days, equal to 30% of the principal loan balance or 19.5% of the properties fair market value. Such a contribution would be considered a material equity infusion into the property, not a repair/replacement reserve deposit. Moreover, the Demand Letter fails to address the Replacement Reserve.

Of the $604,600, there were only $8,700 (or 1.44%) worth of repairs which were not previously included in the 2013 BEST Report and therefore known by Fannie Mae when it closed the transaction. That means that 98.56% of the dollars demanded per the 2018 AEI Report were for repairs similar to those addressed by the 2013 BEST Report and known to Arbor and Fannie Mae when it closed the transaction. The repair issues raised in both reports are as-expected and typical for a Class-C property of this size and age, which is why Fannie Mae closed the loan with knowledge of the repairs and despite their existence.

Arbor and/or Fannie Mae were keenly aware of the condition of the Property as of the Closing Date for the following reasons:
- The 2013 BEST Report defines the Property as built in 1970 and in "Good to Fair" Condition;[2]
- The 2014 Appraisal (also procured and relied upon by Arbor as part of its due diligence on the Refinance) defines the Property as a Class C[3] and in 'average condition'[4] for its age;
- Prior to loan approval by Arbor and/or Fannie Mae a site tour of the Property was conducted to, among other things, inspect its condition; and
- Arbor and/or Fannie Mae, or their respective agent, reviewed the 2013 BEST Report and 2014 Appraisal, as this is industry standard practice.

---

[2] 2013 Best Report; Physical Needs Summary Chart
[3] 2014 Appraisal; Page 2
[4] 2014 Appraisal; Page 42

The typical industry standard definition of a Class C multifamily asset, such as the Property, is an asset "over 30 years old, with a dated exterior and interior, and few, if any amenities…many Class C multifamily property apartments still contain original appliances and light fixtures. Foundation and structural problems could exist, and any improvements that have been made over the years might require major repairs or replacement."[5]

Representatives of Arbor and/or Fannie Mae had detailed knowledge as to the condition of the Property as of the Closing Date and notwithstanding the condition, approved funding the loan transaction, without conditions and without requiring any repair escrows at Closing.

Not only was none of this information new to Fannie Mae in 2017, but it was all to be expected based on the size, age and class of the Property. Older Class-C properties have almost a revolving door of repair and deferred maintenance items. This is especially true when there are 27 different foundations, exteriors, roofs, etc.

Any suggestion that Arbor and Fannie Mae were unaware of the condition of the Property as of the Closing Date is unreasonable, unforeseeable and unlikely. In the 37 months between the Refinance and the Demand Letter, the Property was maintained in substantially the same, or better, condition as it had been prior to the Refinance[6]; no deterioration occurred to the Lenders collateral. At all times relevant hereto, the Property has been and continues to be a Class-C multifamily asset and maintained accordingly.[7]

Moreover, there are no facts in evidence to suggest that as of the Closing Date the condition of the Property was at issue for Arbor and/or Fannie Mae. There do not appear to be any approved asset management, operations, and/or maintenance plans. Had Arbor and/or Fannie Mae had concerns over the condition of the Property, a typical condition precedent to loan funding would have been an agreed to and approved plan to make the requisite repairs. If Arbor and/or Fannie Mae had any concerns over the condition of the Property prior to the 2017 AEI Report, those concerns were never expressed and left no paper trail. There is no evidence in the record to support such a claim. The only thing that exists is the Replacement Reserve.

In 2019, the Velocity Report was issued and concluded $314,045 in 'Total Immediate Repairs' as compared to the $604,600.00 reported by the 2018 AEI Report – a 48% reduction in anticipated cost. Given the sheer size of that gap, hindsight shows that the Lenders binary decision (to accept the 2017 AEI Report in whole, but not in part) was not warranted; instead further investigation as requested by Brookville was more than appropriate and reasonable.

The 2018 AEI Report makes substantially the same commentary as the 2017 AEI Report in relation to the Property and suggested 18 repairs, which totaled $604,600. Those repairs are as follows:

---

[5] https://www.cwscapital.com/insights/multifamily-asset-classes-a-b-and-c-explained-which-is-best-for-you-/
[6] 2019 Borrower Affidavit
[7] 2019 Borrower Affidavit

-6-

**Life Safety:** *Concrete Flatwork/Sidewalk (Total Cost $8,000 / 1.32% of Total):*

The only Life Safety concern raised by the 2017 AEI Report was to repair areas of concrete flatwork as it was a potential trip hazard. A cost of $8,000 was associated with this line item. The unit of measurement provided, LS (Lump Sum), is too vague to provide significant clarity on the true scope of work required and no further, clarifying detail is provided.

While 2017 AEI Report Chart 2.1 classified the trip hazard as a Life Safety concern, the commentary contained in Section 3.1.1 paints a much more benign picture. Section 3.1.3 therein states "the flatwork, stairs and railings appeared to be generally in good to fair condition. However, localized areas of cracking, surface deterioration, differential settlement and heaving were observed throughout the site." [8]  Section 3.1.3 also includes three photographs that shows a worn sidewalk.[9]

  

While the 2018 AEI Report classifies the sidewalks as a Life Safety item, Table 1.2 of that report states that the sidewalks have 15 years of useful life remaining and have a 1-5 rating (with 1 being the best and 5 being the worst) of 3. This rating of 3 is superior to the rating given to the Property which was a 4. Therefore, while some patching and smoothing was required, its apparent that the sidewalks were in above average condition, for the Property, as of the 2018 AEI Report.

The 2013 BEST Report suggested that 28 sections of sidewalk near Buildings 8, 9, 10, 11, 17, 18 and 23 be replaced. The 'Photograph' Exhibit to the 2013 Best Report showed the following two pictures of the sidewalks at the Property.

 

These pictures show that Arbor and Fannie Mae both had actual knowledge of these issues at the time of the Refinance. The flatwork was the only "Life Safety" repair stated in the 2017 AEI

---

[8] 2017 AEI Report; Section 3.1.1
[9] Photographs are from the 2018 AEI Report

Report, the report which was the sole basis of the Demand Letter. Moreover, based on the optics of the images, it does not appear that any deterioration has occurred. In fact, the opposite appears true whereby the newer pictures appear to have better flatwork then the older pictures, a sign of active maintenance of the Property. Notwithstanding, the flatwork is representative of what is expected and typical at a 49-year-old, Class-C property.

Based on Arbor and Fannie Mae's historical knowledge of the flatwork, there is very little, if any, change in circumstance or condition of the flatwork on site. Additionally, given the 27 different buildings there is likely flatwork in need of repair around the Property with some regular frequency. It cannot be deemed reasonable as is not within accepted industry standards to place borrowers in default every time the 49-year-old sidewalk cracks.

Regardless, and of most importance, per the Velocity Report, all of the required repairs to the flatwork have been completed.

### *Life Safety: Repair Stair Treads (Total Cost $5,400 / 0.89% of Total):*

The 2017 AEI Report did not conclude that any repairs to the stair treads were required. The 2018 AEI Report cited that stair treads at Building 9 needed repair.

Wear and tear on stair treads is normal in properties without elevators. This is a normal maintenance item of which Arbor and Fannie Mae were aware at the time of the Refinance. Again, given 27 different buildings, each with only one set of stairs, there is likely always a stair tread that arguably could be repaired or replaced.

Notwithstanding, per the Velocity Report, all the repairs to the stair treads have been completed.

### *Life Safety: Fire Alarm Panel Inspection (Total Cost $1,000 / 0.17% of Total):*

While the 2018 AEI Report did not inspect the fire panel it suggested such an inspection be performed and estimated a cost of $1,000. The Velocity Report included an inspection of the fire panel. No issues were found. This cost estimate was not included in the 2017 AEI Report.

### *Life Safety Summary:*

As of the 2017 AEI Report, there were no Life Safety issues that existed which warranted either the Demand Letter, the Default Letter or the Demand Notice.

The total anticipated cost of the Life Safety Repairs, per the 2018 AEI Report, was $14,400. Given the size of the Replacement Reserve, the Lender was over collateralized by 15.25x the amount of the Life Safety Repairs.

***Critical Repair:*** *Investigate Water Leak in Unit 3B (Total Cost $500 / 0.08% of Total):*

The 2018 AEI Report stated that the "tenant in unit 3B reported that the water flows out of the ceiling and in his bathroom on occasion." There was no mention of these claims in the 2017 AEI Report. Per the Velocity Report, these claims were made by the tenant in 2016 and upon inspection there is no current evidence of leaking.

***Critical Repair:*** *ADA Parking Signage (Total Cost $600 / 0.10% of Total):*

Per the Velocity Report, an ADA parking sign is installed on the Property.

This line item is included in the $8,700 which were "new" issues with the Property that Arbor or Fannie Mae did not previously have knowledge. Notwithstanding, the 2013 BEST Report did not cite any specific ADA deficiencies.

***Critical Repair:*** *ADA Door Lever (Total Cost $100 / 0.02% of Total):*

Per the Velocity Report, an ADA door lever is installed on the Property.

This line item is included in the $8,700 which were "new" issues with the Property that Arbor or Fannie Mae did not previously have knowledge. Notwithstanding, the 2013 BEST Report did not cite any specific ADA deficiencies.

***Critical Repair Summary:***

As of the 2017 AEI Report, there were no Critical Repair issues that existed which warranted either the Demand Letter, the Default Letter, the Demand Notice or which could not have been cured within 60 days.

The total anticipated cost of the Life Safety and Critical Repairs, per the 2018 AEI Report, was $15,600. Given the size of the Replacement Reserve, the Lender was over collateralized by 14.0x the amount of the Life Safety Repairs.

***Deferred Maintenance:*** *Drainage at Rear of Building 10 (Total Cost $7,500 / 1.24% of Total):*

Both the 2017 AEI Report and the 2018 AEI Report addressed drainage concerns in the rear of Building 10.

This repair was not noted in the 2013 BEST Report and therefore is also included in the $8,700 which were "new" issues with the Property that Arbor or Fannie Mae did not previously have knowledge.

Per the Velocity Report, these repairs have been completed.

***Deferred Maintenance:*** *Asphalt Paving (Total Cost $140,000 / 23.16% of Total):*

Both the 2017 AEI Report and 2018 AEI Report required the entire asphalt parking lot to be milled. This is a highly binary conclusion and is a fairly non-standard conclusion given that Table 1.2 states that the parking pavement has 12 years (or 48%) of useful life remaining. Complete replacement of parking lots halfway through their useful life does not make economic sense when more cost-effective remedies exist and is outside the standards of normal industry practice.

The 2013 BEST Report also discussed the repairs to the asphalt parking lot, however, that report suggested a bifurcated approach of replacing the most damaged areas and repairing the less damaged areas. Specifically, the 2013 BEST Report suggested to mill and repair roadway centers for Buildings 1, 3, 5, 7, 8, 11, 16, 18, 20 and 22 with the balance of the parking lot to receive only a slurry coat and restriping.

In fact, both the 2014 Appraisal and the 2013 Best Report show pictures of the parking lot being worn and in need of repair and/or replacement. The fact that the parking lots required long term deferred maintenance was not new information to Arbor or Fannie Mae in 2017. As such, the asphalt paving should not constitute grounds for default.

  

Like the 2013 BEST Report, the Velocity Report takes a more balanced, less binary approach to asphalt repairs. It suggests bifurcating the repairs into replacement and repair/overlay. The approach taken by the Velocity Report suggests a total cost of $42,000 as compared to the $140,000 suggested by the 2018 AEI Report. This $98,000 differential is highly material as it equals 4.9% of the original loan amount! The findings of the Velocity Report are in line with the 2013 BEST Report which suggested $29,250 in parking lot repairs, especially when six years of inflation and increased demand is considered.



As is shown by the chart above, the parking lot repair estimates provided by both the 2017 AEI Report and the 2018 AEI Report are inflated and materially out of line with the two other inspection agencies. Economic pragmatism is missing from the AEI Reports.

It is also noteworthy that both the 2017 AEI Report and 2018 AEI Report contained a math error in Chart 2.1 for asphalt costs. The Chart reported $115,000 but using the correct computation according to AEI's inflated scope the total AEI actually demanded was $140,000 (70,000 SF @ $2.00 SF).

***Deferred Maintenance:*** *Fence Repair (Total Cost $4,500 / 0.74% of Total):*

The 2018 AEI Reports called for repainting the fence, however, according to the Velocity Report the pricing utilized by AEI is more indicative of replacement rather than repainting.

Repainting versus replacing will save $2,800 from the initial cost estimate, per the Velocity Report.

The 2013 BEST Report does not note any need for fence repair. Repainting of fences is normal wear and tear on a property and does not amount to a default.

***Deferred Maintenance:*** *Barren Turf (Total Cost $13,500 / 2.23% of Total):*

The 2018 AEI Reports called for adding landscape material to areas of barren turf. Barren turf was also reported in the 2013 BEST Report and is part of normal wear and tear on a property. Regardless of how many times the Borrower were to reseed areas of barren turf, it is difficult to change 50 years of habitual traffic patterns without fencing off areas. It is likely that no matter how many times this area is reseeded, without fencing barren turf is likely to persist. These barren areas are too high of traffic areas that fencing is not likely to be appropriate.

Given the low probability of permanently curing this problem, without fencing, more cost-effective plant material can be acquired than was suggested by the AEI Reports. Utilizing the cost recommendation from the Velocity Report a savings of $10,350 can be realized from AEI's estimate.

The Velocity Report provided a cost which was nearly half of that suggested by the 2018 AEI Report. REEW recommends receiving three bids for the work to better determine price and scope.

**_Deferred Maintenance: Exterior Finishes (Total Cost $60,000 / 9.92% of Total):_**

As is expected with any Class C building which is over 40 years old, the buildings exterior shows signs of its age and wear and tear. This is an unavoidable consequence of any construction method over time.

This normal wear and tear is noted in the 2013 BEST Report.

The 2018 AEI Report and Velocity Report differ substantially on the cost of these repairs. The 2018 AEI Report suggest a cost of $60,000 (or $500/unit) and the Velocity Report suggests $47,250 (or $1,750 per building). The cost guidance provided by the Velocity Report saves $12,700 from the AEI cost estimate.

As the cost differential between the two reports is 21%, REEW recommends that three bids be received for the work and evaluated on scope and price.

**_Deferred Maintenance: Roof Replacement (Total Cost $208,000 / 34.40% of Total):_**

Much like the parking lot repairs, in terms of the roofing systems, the 2013 BEST Report suggested a balanced approach between replacement and repair. The 2017 and 2018 AEI Reports did the opposite and again recommended a binary result, full roof replacement of all 27 roofs. This recommendation was made despite that Table 1.2 states that the roofing systems had five years of remaining useful life. Moreover, the 2013 BEST Report shows that the required repairs were made post-inspection, and therefore it can be concluded that as of the Closing Date none of the roofs are in need of any immediate repair or replacement.

AEI's binary approach imposes a one size fits all solution for the roofing systems rather than verifying each individually. Had the 2018 AEI Report verified the age of the individual roofs AEI would have learned that Buildings 1, 9, 12, 13, 14, 15, 18, 19, 21, 23 and 25 each had the roof replaced within the last few years and were all less than 10 years old.[10] These buildings amount to 44% of the Property. If these building roofs are excluded pro rata from the replacement list, the projected cost decreases by $92,125[11] or 4.6% of the original loan amount!

---

[10] Velocity Report; Table 2.7
[11] Roofing cost differential between the 2018 AEI Report and the Velocity Report.

Moreover, as stated above, the fact that some of the roofs required repair and/or replacement was not new information to Fannie Mae and Arbor in 2017. The following are pictures of various roofs from the 2013 BEST Report.

 

Similar to the parking lot repairs, the repair totals suggested by AEI far exceed the three other service providers. Both the 2011 Dominion Report and the 2013 BEST Report stated no roof repairs were required.



***Deferred Maintenance:*** *Damaged Window 27D (Total Cost $500 / 0.08% of Total):*

Per the Velocity Report, these repairs have been completed since the 2018 AEI Report.

This line item is included in the $8,700 which were "new" issues with the Property that Arbor or Fannie Mae did not previously have knowledge.

***Deferred Maintenance:*** *Laundry Water Heater & Access (Total Cost $1,000 / 0.17% of Total):*

Per the Velocity Report, these repairs have been completed since the 2018 AEI Report.

***Deferred Maintenance:*** *Electrical Repairs (Total Cost $1,000 / 0.17% of Total):*

-13-

Per the Velocity Report, these repairs have been completed since the 2018 AEI Report.

**_Deferred Maintenance:_** _Exterior Light Fixtures (Total Cost $3,000 / 0.50% of Total):_

Per the Velocity Report, these repairs have been completed since the 2018 AEI Report.

**_Deferred Maintenance:_** _Renovate Down Units (Total Cost $120,000 / 19.85% of Total):_

AEI made a miscalculation in relation to down units. The 2018 AEI Report classified twelve units as down whereas the Velocity Report only cited 10 units down and one online but in need of minor repairs. This error in scope reported $18,250 in excess cost.

Notwithstanding, the renovation of down units is typically a business decision that is afforded to the landlord so long as they can satisfy all debt obligations without the income from the down units. In this case, all debt obligations have been satisfied and therefore renovation of down units cannot constitute a basis for a claim of default.

**_Deferred Maintenance:_** _Renovate Occupied Units (Total Cost $30,000 / 4.96% of Total):_

The 2018 AEI Report stipulated a budget of $7,500 for each of the 4 units in need of renovation. Comparatively, the Velocity Report based on its site inspection recommended $2,500 for the same updates. While this price differential merits further bidding of work, the extent of renovations, if any, is also typically a business decision made by the landlord. As both reports noted 4 units in need of repair, the total differential between these two cost estimates is $20,000.

The amount of these improvements must be a delicate balancing act with the return (e.g. increased rental income) on that investment. If the return doesn't merit the investment, the landlord should make lesser repairs which come with a higher return on capital. No matter how much capital investment is made into the Property, a Class-C property is unlikely to ever become a Class-A property.

**_Deferred Maintenance Summary:_** As of the 2017 AEI Report, there were no Deferred Maintenance issues that existed which warranted either the Demand Letter, the Default Letter, the Default Notice, or which could not have been cured within 12 months, inclusive of the 20 business days of forbearance requested.

### 2. *No Breach of the Loan Documents Occurred:*

The Defendants have not breached the Loan Documents. The breach asserted in the Demand Letter was a manufactured breach and the default stated in the Default Letter and Default Notice was a manufactured default.

According to the Complaint, Fannie Mae's sole justification for asserting breach and the subsequent default was the 2017 AEI Report. Based on that report, Fannie Mae asserted that

Brookville "failed to maintain the [Property] in good repair and condition."[12] There are no facts in evidence to suggest that the condition of the Property was at issue between the parties prior to May 2017.

As noted above there was no deterioration in the condition of the Property between the Closing Date and the 2017 AEI Report, ordinary wear and tear excepted. The contents of that report were not totally unexpected, as they existed at Closing; however, the dollar amounts demanded by Fannie Mae certainly were! It is always possible to find a roof that needs repair/replacement, a pot hole to patch, or a litany of other minor repairs, as that is what is typical of an almost 50-year-old, Class-C asset with 27 different buildings. Moreover, this is the intent behind the Replacement Reserves. It is understood that repairs and replacements will be required over the loan term and thus the intent of the Replacement Reserves. Notwithstanding, the Lender never offered to apply any funds from the Replacement Reserves to offset the amounts asserted by the Demand Letter, the Default Letter and the Default Notice.

The alleged breach is made even more tenuous by the contents of the 2017 AEI Report for the following reasons:

- Only One Life Safety Violation – This report cited only one Life Safety violation, the sidewalks. In terms of PCA reports, one Life Safety violation, especially of this type, is not considered to be troublesome.
- Life Safety Classification Selection – The classification of these repairs as Life Safety (versus a Critical Repair) is a wholly subjective decision, especially considering the relevant facts relating to the flatwork.
- Narrow Distinction Between Life Safety and Critical Repair – According to the Demand Letter, the key distinction between Life Safety and Critical Repairs is the duration to cure, 30 and 90 days respectively. This is a different threshold than was presented by the 2017 AEI Report which provides 6 months for performance.
- Sidewalk Quality – The 2017 AEI Report provides inconsistent statements in relation to the sidewalks. Those inconsistencies include, but are not limited to:
  o While classified as a Life Safety issue, the text of Section 3.1.3 is far from condemning on flatworks condition;
  o Table 1.2 states that the flatwork has 15 years of use life remaining;
  o Table 1.2 rates the sidewalks a 3, an above average score for the Property;
  o Section 2.1 and Section 3.1.3 fails to provide any detail as to the true scope of work required. The LS label of measure is too vague to be reliable in terms of quantities, scope and dollars; and
  o Notwithstanding any of the foregoing, any flatwork deficiencies are highly curable in a short period of time.
- Velocity Report – At the time of the Velocity Report, all flatwork issues had been cured.

Given: (a) the lack of clarity as to the true scope of flatwork repairs required per the 2017 AEI Report; (b) that the sidewalks in general had 15 years of useful life remaining; and (c) the sidewalks were rated in above average condition for the Property, the decision to classify these as Life Safety rather than Critical Repairs was wholly subjective and made in the sole determination

---

[12] Complaint Section B19

of one singular AEI inspector. Regardless, in the scope of Life Safety items, flatwork repairs skew toward the less significant end compared to more material deficiencies such as roof failures, mold or rodent infestation.

The foregoing illustrates that an argument that the flatwork repairs were so grave, serious and material that they truly constituted a material Life Safety risk as to warrant a default simply doesn't pass a basic reasonableness test. At the minimum, the alleged default is highly tenuous and unlikely to be durable. This alleged default must dance on the head of a pin to have any sticking power.

Upon Brookville's receipt of the 2017 AEI Report, it knew that the price attached was high and that therefore the report was unreliable. Brookville acquired the Property in 2012. At that time, the 2011 Dominion Report was issued and called for $71,215 in Critical and Non-Critical Repairs. In 2014, just over two years later, Brookville refinanced the Property with Arbor and Fannie Mae. At that time, the 2013 BEST Report was issued and it called for $74,050 in repairs. It came as no surprise to Brookville that the 2011 Dominion Report and the 2013 BEST Report were consistent with each other. Notwithstanding the upkeep performed,[13] three years afterward, in 2017, AEI issued the 2017 AEI Report. Unlike the two previous reports, this 2017 AEI Report called for $414,650 in repairs – a 459% increase in the cost of repairs associated with the Property. If that amount wasn't high enough, the 2018 AEI Report was then issued and it called for a 45.8% increase in cost over the 2017 AEI Report which amounts to a 716.5% increase in cost over the 2013 BEST Report. Given its historical knowledge and repairs to the Property, Brookville was reasonable to immediately question the scope and findings of the AEI Reports. In 2019, at Brookville's cost, the Velocity Report was issued and it called for a 45.2% reduction in cost from the 2018 AEI Report.



---

[13] 2019 Borrower Affidavit

Given its five years of ownership and operational history with the Property, Brookville was confident that the 2017 AEI Report could not be correct in terms of the scope and associated repair costs. As such, Brookville requested that Arbor and/or Fannie Mae evaluate a second PCA which Brookville would procure at its own cost. This request was denied with almost no consideration. Not only was Brookville within its rights to make such a request but the results of the Velocity Report show that Brookville's intuition was correct – that the AEI Reports were incorrect on both the scope and cost associated with many of the cited repairs. These requests were further reasonable given how over collateralized the Lender was on the Life Safety and Critical Repairs given the substantial size of the Replacement Reserve.

When a borrower is placed in default, it its typically for material defaults such as failure to make payments when they become due, failure to pay property tax or insurance, having liens attached to the property that comprises the lenders position, fraud, misrepresentation, etc... None of that occurred in the instant matter.

For a borrower who had not missed a payment or been in material breach, common sense would dictate that a "failure to maintain" alleged breach may be an area where a lender could exhibit some forbearance, reasonableness and cooperation, especially when presented with a reasonable request. That did not occur.

The combination of: (a) Arbor and/or Fannie Mae's prior knowledge of the Property's condition; (b) the lack of material or monetary default; (c) the lack of collateral deterioration; (d) the unreasonableness of a 459% increase in cost from the 2013 BEST Report and the 2017 AEI Report; (e) a highly questionable and subjective determination of a low quality Life Safety issue; (f) the improvements/repairs made into the Property; and (g) the miscalculations in scope and cost of the AEI Reports, it is REEW's opinion that no breach occurred.

The breach and default alleged by the Demand Letter and Default Letter, respectively, were manufactured. The alleged default is not durable enough to be anything but manufactured. As no default occurred, Brookville should not be required to pay late charges, penalties, default interest or attorney's fees, etc. which accompany their manufactured breach claim.

### 3. *Arbor and Fannie Mae Failed to Act in Good Faith in Addressing Borrower Concerns:*

One of the overarching principals associated with the conduct of business is the notion of good faith and fair dealing. This is especially true when dealing with a governmental agency and their agents.

Given Brookville's knowledge that the 2017 AEI Report was incorrect in scope and expense, it was reasonable and within Brookville's rights to request a second report. Brookville requested 20 business days of forbearance.

However, Arbor and Fannie Mae responded in a binary fashion and Brookville's requests were denied without any substantive dialog on the merits of Brookville's assertions. Just as the 2018 AEI Report was highly binary in its classification of repair issues, Arbor and Fannie Mae have been equally binary in their handling of this manufactured default. Arbor and Fannie Mae

refused to apply funds currently in reserve against the outstanding balance per the Demand Letter and failed to respect the reasonable request of the Borrower when in 2018 they re-hired AEI fully aware of Brookeville's concerns with and opposition to AEI rather than another independent and mutually agreeable third-party provider to procure the 2018 report. Surely, given how over collateralized Fannie Mae was on the Life Safety and Critical Repairs, 20 business days of forbearance would not result in any change to their position or security of their investment.

Arbor and/or Fannie Mae did not handle the transaction with Brookville observing the principals of good faith and fair dealing or customary industry practice.

### 4. *The Claims Asserted by Arbor and Fannie Mae Are Not Made In Good Faith:*

The issuance of debt instruments presents less risk than equity investments. Corresponding with this decreased risk comes decreased return (e.g. interest rate) and the primary objective of preservation of capital. Preservation of capital is best achieved by financing properties at low loan to value ("LTV") ratios. The lower the LTV, the more equity which is subject to forfeiture before the debt instrument is at risk. If debt financing is utilized, typical market ranges are from 60-75% LTV. Some private debt funds even issue notes as high as 80-90% LTV.

Per the 2014 Appraisal, the fair market value of the Property was $3,100,000. The Refinance provided Brookville with $1,995,000 in debt financing, a 64% LTV as of the Closing Date. The low LTV provides Arbor and/or Fannie Mae tremendous security in their collateral. To be clear, for Arbor and/or Fannie Mae to have any risk of loss, the value to the Property would need to decrease by over 35%. Per the 2017 Statement, the Current Principal Balance of the loan was $1,888,706.89, a 61% LTV[14].

The 2019 Appraisal reported a fair market valuation of $4,000,000 with a $300,000 reduction in value per the findings of the Velocity Report. This revised FMV of $3,700,000 represents a 19% increase over the valuation stipulated as of the Closing Date, at which point the Property was valued at $3,100,000. If the value of the Property has increased since the Refinance, how could the Borrower possibly have failed to maintain the Property? Properties which are not maintained properly do not increase in value. While the exact amount of the current loan balance is unknown, it is estimated to be $1,850,000[15]. At this loan amount, the Property is currently financed to a 50% LTV, an extremely conservative LTV. Given this low LTV there is a very low probability of risk of loss on the Lenders behalf. Moreover, given an increase of $600,000 in the fair market value since the 2014 Appraisal, the asserted default for "failure to maintain" becomes even more dubious. Again, properties which are not properly maintained and in need of significant repair do not increase in value.

Further complicating matters, the Lender has been totally uncooperative with the Borrower in terms of refinancing Fannie Mae out of the current loan. The Lender has stated that it is unwilling to release the mortgage on the property without payment in full of all penalties, default interest and attorney's fees associated with the alleged, manufactured default. These claims are not made in good faith. The breach and corresponding default did not occur and any claims to the

---

[14] Utilizing the FMV per the 2014 Appraisal.
[15] Current Principal Balance from the 2017 Statement minus 15 months of Principal Payments, rounded.

contrary are tenuous at best. Moreover, the fact that the Lender is materially over collateralized on all repairs which are not long term deferred maintenance makes this position even more unreasonable.

Given the extremely high security of Arbor and/or Fannie Mae's collateral, the intent behind the alleged default is unclear. There was no monetary default, there were essentially zero Life Safety repairs which were cited and yet, Arbor and Fannie Mae issued the Demand Letter, failed to negotiate or be reasonable, then issued the Default Letter and Default Notice. Following that, Arbor and Fannie Mae have not worked in good faith with the Borrower to refinance the Property. The extremely low LTV mitigates any real risk that the Lender has in seeking to preserve its capital investment.

## CONCLUSION:

After review of all relevant documentation and consideration of all relevant facts, it is REEW's expert opinion Brookville did not breach the Loan Documents and therefore no default occurred. The alleged default was manufactured by Arbor and/or Fannie Mae and is not sustainable under the Loan Documents and/or accepted industry practice.

REEW makes the following findings and conclusions:

1. Brookville has at all times made each and every principal, interest, tax, insurance or reserve replacement escrow payments. Therefore, no monetary default under the Loan Documents occurred (nor has Fannie Mae asserted any exist).

2. Brookville never committed fraud, misrepresentations or allowed any liens to attach to the property and thus no material default under the Loan Documents occurred.

3. Arbor and Fannie Mae possessed detailed knowledge of the Property's condition as of the Closing Date, specifically as it relates to the sidewalk flatwork, roofing systems, building exteriors and parking lot asphalt, and therefore these items cannot constitute a post-Closing event of default, under the Loan Documents.

4. From the Closing Date through the 2017 AEI Report, Borrower used commercially reasonable efforts to maintain and repair the Property in a manner commensurate with accepted industry practices for an almost 50-year old Class–C property and that the Property has been and continues to be in a state of good repair and marketable condition.

5. Based on the 2019 Appraisal, it is clear that the fair market valuation of the Property has increased since Closing. Properties which are inadequately maintained, as alleged, do not increase in value. As a result, it is clear the Property has been properly maintained.

6. Arbor and/or Fannie Mae's actions, demands and conduct has failed to reflect the substantial balance of the Replacement Reserves and the corresponding impact on the urgency of the receipt of funds/lack of willingness to provide reasonable forbearance.

7. The Replacement Reserves are likely currently $265,645 as Borrower has made 15 additional months of reserve payments at $3,050 per month. Given the increased size of the Replacement Reserves, the Lender is ever further secured in its position.

8. The findings of the AEI Reports are exaggerated both in terms of the scope of required repairs and the costs associated with the same.

9. The repair costs associated with the AEI Reports far exceed the three other PCA's available, such that they are not creditable and should not be considered by the Court.

10. The AEI Reports failed to incorporate all repairs and replacements made at the Property including, but not limited to, the roofing systems.

11. Based on their historical operational knowledge and the prior reported repairs and the scope of the 2017 AEI Report, Brookville was within its rights under the Loan Documents and/or accepted industry practice to request a second independent PCA be procured.

12. Arbor and/or Fannie Mae failed to act in good faith or within accepted industry standards in addressing Brookville's concern over the 2017 AEI Report.

13. Arbor and/or Fannie Mae failed to act in good faith or within accepted industry standards when AEI was selected to procure the 2018 report given Brookville's prior objections to the AEI findings.

14. Arbor and/or Fannie Mae failed to act in good faith or within accepted industry standards in asserting the manufactured breach and default under the Loan Documents.

15. At all relevant times since the Closing Date, the Lender's collateral has been more than secure based on the below market LTV of approximately 50%.

16. Hypothetically, even if it were determined that the Property had not been maintained properly, given the below-market LTV the likelihood the Lender would suffer any loss of principal is highly unlikely.

17. Arbor and/or Fannie's Mae's lack of cooperation with the Borrower to pay-off the indebtedness does not comply the industry standard notions of good faith and fair dealing.

18. At all relevant times since its receipt of the Closing Date, Brookville has acted in good faith by: (a) maintaining the Property as required for a Class-C multi-family asset; (b) making a reasonable request for 20 business days forbearance to procure a second PCA at its cost and expense; (c) undertaking to repair all Life Safety, Critical Repairs and Deferred Maintenance items per the Velocity Report, where scope and/or cost are not at issue.

19. It is REEW's opinion that Brookville was not in default in 2017, 2018 or 2019 and it is not in default now.

-20-

20. Notwithstanding the lack of actual default, Brookville has used commercially reasonable efforts since the dates of the AEI Reports to cure any and all alleged defaults, except those where scope and price are at issue.

21. Given (a) no breach and/or default occurred under the Loan Documents; and (b) the good faith conduct undertaken by Brookville since its receipt of the Demand Letter, the assessment of late fees, penalties, default interest and attorneys' fees are improper under the Loan Documents and accepted industry standards.

REAL ESTATE EXPERT WITNESSES, LLC
By: Jeffrey S. Rothbart
Date: February 20, 2019

# EXHIBIT A

# Jeffrey S. Rothbart

(312) 307-1429 • jr@realestateexpertwitnesses.com

---

An experienced real estate executive with a proven track record of success in institutional real estate acquisitions, development, finance, capital markets, investor relations & reporting and asset management. Experienced across all major property types in over 50 U.S. cities. Licensed attorney with expertise in real estate, taxation and securities law.

## PROFESSIONAL EXPERIENCE

---

**STACK REAL ESTATE, LLC**  2013 to Present
*A full service real estate firm focused on acquisitions, development, capital markets procurement and consulting.*
- Acquisitions – Acquired over 500 senior living beds, throughout the acuity spectrum.
- Development – Actively developing residential, retail, hotel and industrial sites.
- Procured equity and debt capital for institutional quality acquisition and development projects on a nationwide basis.
- Provided consulting and expert testimony services.
- Affiliated entities include, but are not limited to, Insignia Homes, LLC, Real Estate Expert Witnesses, LLC and Berkshire Hathaway Home Services Koening Rubloff.

**EPN INVESTMENT MANAGEMENT, LLC | EDT RETAIL TRUST, Skokie, IL**  2011 to 2013
*A private investment group focused on retail real estate investments throughout the United States, Europe and Latin America.*
**Vice President, Capital Markets** (8/2011 – 8/2013) | EPN INVESTMENT MANAGEMENT, LLC
Recruited by EPN after its privatization of EDT Retail Trust (see below) to lead the capital markets department which was responsible for equity and debt capital procurement throughout the global platform.
- Spearheaded business development efforts to develop new and further existing equity capital relationships.
- Originated complex capital markets products such as subordinated and mezzanine debt and preferred equity.
- Maintained all of the firm's global relationships with lending institutions (insurance companies, commercial banks and CMBS conduits) and equity investors (pensions, endowments, foundations, sovereign wealth funds, hedge funds and family offices).
- Sourced, negotiated or closed over $500M in crossed collateralized financing for both fixed and floating rate debt.
- Launched EPN's Latin American development and acquisitions platform and evaluated M&A opportunities.
- Advised acquisition team on forecasting and budgeting for prospective investments.
- Served as de-facto general counsel by drafting or negotiating substantially all legal agreements and managing all litigation.

**Vice President, Finance and Asset Management** (1/2011 – 8/2011) | EDT RETAIL TRUST
Oversaw operations of a publicly traded REIT (ASX: EDT) working directly under the CEO. EDT owned 12M square feet of institutional grade real estate located across 20 states with an approximate valuation of $1.43B.
- Spearheaded portfolio and financial management including financial forecasting and budgeting, strategic repositioning, redevelopment, leasing, debt financing and asset-level marketing.
- Managed condemnation process due to road expansion where potential damages exceeded $40 million.
- Prepared financial and investor reporting, including annual reports, quarterly supplemental and Board of Director materials.
- Served as a liaison between the Board Finance, Audit and Investment Committees and applicable third-parties.
- Forecasted REIT and asset level net operating income, expenses and cash flow.
- Worked with DDR Corp. (NYSE: DDR) to streamline reporting to ensure accuracy of property level forecasting and budgeting.
- Reviewed and approved operating and capital expenditure budgets and corporate income statements and balance sheets.
- Performed quarterly, asset valuations across the entire portfolio on an individual asset basis.
- Generated 6.0% annual revenue growth from owned real estate by approving 200 new and renewal retail leases totaling 2M SF with a cumulative first year NOI in excess of $25M.
- Assisted investment banks and advisory consultants in relation to EPN's tender offer and the ultimate disposition of EDT.

**SUPERIOR STREET CAPITAL LLC, Chicago, IL**  2009 to 2011
*A privately-held real estate firm focused on recapitalization and monetization of distressed situations.*
**Managing Director**
Founded a real estate investment firm focused on the acquisition of U.S. commercial real estate through the recapitalization of distressed assets and the monetization of real estate related derivative instruments.
- Implemented tax structuring to mitigate tax consequences to owners of distressed Tenant-in Common syndications through debt restructuring of debt, subordinating investor interest and consolidating management operations.

**BOULDER NET LEASE FUNDS, LLC | THE BOULDER GROUP**, Northbrook, IL  2003 to 2009

*A private commercial real estate group focused on office and industrial investments throughout the United States.*

**Principal** (2004 - 2009) | BOULDER NET LEASE FUNDS, LLC

Co-founded a real estate private equity company specializing in the acquisition of net leased properties.

- Originated $175 million for two real estate private equity vehicles through discretionary and joint-venture investors.
- Managed all aspects of operations including acquisitions, capital markets, finance, asset management and dispositions.
- Acquired and managed over 1.7M SF of net leased properties nationwide.
- Realized a leveraged, net IRR of 25.5% with an equity multiple of 1.8x.
- Sourced on-balance sheet LIBOR based line of credit with Merrill Lynch Capital.
- Structured sale-leaseback transactions in conformance with FASB and GAAP.
- Served as the primary liaison to legal, accounting, securities, insurance and financial advisors.
- Conducted all due diligence review of property, financial, legal, debt, market and tenant related documentation.
- Underwrote transactions and evaluated IRR, equity multiple and cash-on-cash returns using both ARGUS and Excel.
- Maintained firm wide relationships with the brokerage community.
- Managed condemnation process for expansion of a state highway where potential damages exceeded $15 million.
- Drafted all investment committee memoranda and implemented all post-Closing, asset level business plans.
- Managed all investor relations related functions including investor presentations, financial reporting and cash flow forecasting.
- Negotiated all Private Placement Memorandums and Joint Venture Agreements, Letters of Intent, Purchase and Sale Agreements and Loan Documentation.

**Research Director** (2003 - 2009) | THE BOULDER GROUP

Served as the Research Director for a commercial real estate brokerage firm focused on the net lease sector. All published research was used to generate and affirm the investment strategies implemented by Boulder Net Lease Funds.

- Published over 40 articles on the net lease real estate market which have been cited in over 95 real estate publications including Forbes Magazine, The Korpacz Real Estate Investor Survey published by PriceWaterhouseCoopers, Retail Traffic, Net Lease Forum, Globe Street, Commercial Property News, as well as other national and local real estate publications.
- Prepared and reviewed legal documents including, such as limited liability company operating agreements, assignment agreements, triple net leases, real estate purchase contracts and securitized loan documents.
- Consulted, either as an expert witness or on a third-party basis, for institutional investors, municipalities, corporation and secured and unsecured creditors to a bankruptcy as to the valuation of net leased assets on a nationwide basis.

**Associate Real Estate and Tax Attorney,** Field and Goldberg, LLC, Chicago, IL  2003

**Legal Department Associate**, LR Development Company, LLC, Chicago, IL  2000 to 2002

### *EDUCATION*

**Masters of Law in Taxation,** NORTHWESTERN UNIVERSITY, Chicago, IL  2003

**Juris Doctor**, CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL  2002

**Bachelor of Arts in Political Science**, EMORY UNIVERSITY, Atlanta, GA  1999

### *INDUSTRY LEADERSHIP*

| | |
|---|---|
| **Adjunct Professor of Law,** CHICAGO-KENT COLLEGE OF LAW – ILLINOIS INSTITUTE OF TECHNOLOGY, Chicago, IL | 2007 to Present |
| **Survey Participant, PWC Korpecz Real Estate Survey** | 2006 to Present |
| **Moderator**, Green Pearl Events Distressed Real Estate Summit | 2010 |
| **Moderator & Panelist,** Real Share Net Lease Conference | 2007 to 2008 |
| **Member**, Urban Land Institute | |
| **Member**, Association of Corporate Growth & Turnaround Management Association | |
| **Next Generation Newsmakers 35 and Under**, Real Estate Forum | 2007 to 2009 |
| **Top Ten "Net Lease Players,"** Commercial Property News: Best of the Best of 2008 | 2008 |

### *LICENSES & CERTIFICATIONS*

| | |
|---|---|
| Illinois Real Estate Broker | 2015 |
| LEED-AP for New Construction v2.2 | 2009 |
| NASD Series 22 and 63 License | 2004 |
| American Bar Association (State of IL Attorney Registration & Disciplinary Commission) | 2002 to Present |

### *COMPUTER LITERACY*

Highly proficient in Microsoft Office, ARGUS and YARDI

# JEFFREY S. ROTHBART

**EXPERT TESTIMONY**

**Shiner Management Group, Inc. v. Pie Five Restaurants, Inc.**      Chicago, IL
- Served as an expert witness on landlord failure to adequately mitigate damages from early lease termination.

**Tuan Mahn Dang v. Tiffany Nguyen**      Chicago, IL
- Served as an expert witness on deceptive leasing practices

**Jack Riser, et al v. City of Chicago**      Chicago, IL
- Served as an expert witness to opine on the diminution of value of residential homes from the opening of a new runaway at O'Hare International Airport

**Jackiewicz v. Village of Bolingbrook**      Chicago, IL
- Served as an expert witness to opine on the diminution of value of residential homes from the opening of a new runaway at a regional airport.

**OM Capital FM, LLC v. Hotel Capital, LLC**      Fort Myers, FL
- Served as an expert witness on a dispute concerning brokerage fees

**The Groves of Palatine Condominium Association v. Groves of Palatine, LLC**      Chicago, IL
- Served as an expert witness on the standard of care for real estate developers as it relates to construction defects.

**Donna Y. T. Ching v VRE Chicago Eleven, LLC, Verdad Real Estate, LLC, EXP Realty Advisors, Inc. and Tartan Realty Group, Inc.**      Chicago, IL
- Served as an expert witness on the net lease sale leaseback industry and the applicable standard of care for brokerage activities.

**Dale Matson v Siemens Energy & Automation, Inc. n/k/a Siemens Industry., et al.**      Chicago, IL
- Served as an expert witness on the industry standard of care for a landlord under a triple net lease

**Crystal Lake Limited Partnership v. Baird & Warner Residential Sales, Inc.**      Chicago, IL
- Served as an expert witness in a landlord tenant dispute.

**Mark Carlson, Robb Carlson and Thomas Vana v. Letke & Associates, et al**      Chicago, IL
- Served as an expert witness for the Defendant in litigation discussing the standard of care for commercial real estate investment.

**Pacific Indemnity Insurance Company v. Loyola University**      Chicago, IL
- Served as an expert witness for the Defendant in litigation relating to potential damaging resulting from adjacent construction.

**Brian Germain and Rita Germain v. Steven Link and Emily Link**      Winnetka, IL
- Served as an expert witness for the Plaintiff in a breach of representation and warranties in a residential Purchase and Sale Agreement.

**Blackrock Burr Ridge, Inc. v Sterling Bay Companies, LLC et al**      Chicago, IL
- Served as an expert witness for the Plaintiff in litigation relating to the interoperation of the LLC operating Agreements and profit sharing.

**Clark County v. HQ Metro, LLC**      Las Vegas, NV
- Served as an expert witness for the County in the valuation of the Metro Police Headquarters.
- Testimony related to the valuation of commercial real estate.

# Jeffrey S. Rothbart

**Eckerd Corp v. Patrick Mastro**  Schenectady, NY
Schenectady County Supreme Court  June 2008
- Served as an expert witness for the County in a dark Eckerd property tax appeal.
- Testimony related to valuation of commercial real estate.

**CVS Albany LLC v. The Assessor of the Town of Colonie**  Colonie, NY
New York Supreme Court of Albany County, New York  April 2008
- Served as an expert witness for the County in a CVS property tax appeal.
- Testimony related to valuation of commercial real estate.

**Jurgens and Wittig c/o Walgreens v. Town of Brattleboro**  Brattleboro, VT
Vermont State Appraiser  April 2007
- Served as an expert witness for the County in a Rite Aid property tax appeal.
- Testimony related to valuation of commercial real estate.

**Rite Aid of New York v. Assessor and The Board of Assessment Review of the Town of Colonie**  Colonie, NY
New York Supreme Court of Albany County, New York  April 2007
- Served as an expert witness for the County in a Rite Aid property tax appeal.
- Testimony related to valuation of commercial real estate.

**In re TEC Foods, Inc.**  Detroit, MI
United States Bankruptcy Court for the Eastern District of Michigan Southern Division  March 2007
- Served as an expert witness for the largest unsecured creditor in the Chapter 11 proceedings.
- Testimony related to valuation of net leased restaurant locations via a sale leaseback transaction.

**Brooks Drugs, Inc. v Board of Assessors and Board of Assessment Review of Schenectady**  Schenectady, NY
Schenectady County Supreme Court  June 2006
- Served as an expert witness for the County in a CVS property tax appeal.
- Testimony related to valuation of commercial real estate.